# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                                    ) | 2:11cr207 |
| ) | **Electronic Filing** |
| MICHAEL J. KRAMER                      ) | |

## MEMORANDUM ORDER

AND NOW, this 10th day of January, 2023, upon due consideration of Michael J. Kramer's ("defendant") motion for compassionate release as supplemented, [210] his submitted medical records, and the government's responses thereto, IT IS ORDERED that [206] the motion as [211], [212], [215], [216], [217], [225] supplemented be, and the same hereby is, DENIED.

On September 13, 2011, defendant was indicted on four separate counts and subsequently pled guilty to count two – armed bank robbery; count three – possession of a firearm by a convicted felon; and count four – using and carrying a firearm during and in relation to a crime of violence.  He was sentenced to 156 months' imprisonment at count two and 120 months at count three, to run concurrently, and 84 months at count four, to run consecutively, for a total term of 240 months. Thereafter, defendant filed the motion for compassionate release and several supplemental submissions in support of the motion; the motion as supplemented is now pending before the court.

Section 601(b) of the First Step Act of 2018 made modifications to 18 U.S.C. § 3582, which previously authorized the Director of the Bureau of Prisons to file a motion with the court to modify a term of imprisonment that had already been imposed where "extraordinary and compelling reasons warrant[ed] such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  While defendant indicates that he submitted requests for compassionate release to the Warden at FMI Gilmer in both September and December of 2020, the record does not show whether or not the Warden responded to either request.  Nonetheless, Section 601(b) of the First Step Act

authorized prisoners to present such motions for "compassionate release" directly to the court. Defendant has requested relief pursuant to such a motion.

In support of his motion, defendant identifies what he characterizes as a number of "extraordinary and compelling reasons," which he asserts are unique and warrant relief under an individualized assessment. These include, but are not limited to, (1) recent outbreaks of COVID-19[1] infection at FCI Gilmer,[2] which institutional setting assertedly does not allow inmates the ability to protect themselves from the spreading virus, especially those inmates deemed "vulnerable" due to preexisting medical conditions; (2) his risk of severe illness and/or complications from COVID-19 due to his physical condition of being obese, previous habit of smoking, and history of hypertension, anxiety, depression, and chronic back/neck pain; (3) defendant's purported "long-term institutional behavior and participation in educational and programming activities [at FCI Gilmer which] has been exemplary" . . . "evidencing that recidivism is unlikely . . . ."; and (4) defendant's "viable" plan for reintegration into society.

Defendant has failed to demonstrate that the court should exercise its discretion and grant the relief he seeks. The compassionate release provision states that a district court "may reduce the term of imprisonment" and "impose a term of probation or supervised release" if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Before granting compassionate release, a district court must consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." § 3582(c)(1)(A). Those factors include, among other things, "the nature and circumstances of the offense and the history and

---

[1] The novel coronavirus, or SARS-CoV-2, is a virus that spreads through exposure to respiratory fluids such as droplets or aerosol particles. See https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html. The disease that can result from exposure is known as COVID-19, which was first identified by the World Health Organization on February 11, 2020. https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html.

[2] The record indicates that defendant subsequently was transferred to USP Hazelton.

characteristics of the defendant," § 3553(a)(1), and the need for the sentence to "reflect the seriousness of the offense, [] promote respect for the law, [] provide just punishment for the offense; [] afford adequate deterrence to criminal conduct; [and] protect the public from further crimes of the defendant." § 3553(a)(2)(A)-(C).

On balance, review of the available information pursuant to the relevant factors does not warrant the relief defendant seeks.  The court recognizes that the defendant's conditions of being obese, a former smoker, and suffering from high blood pressure and depression likely place him at heightened risk for more severe complications from COVID-19.  See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  (identifying obesity, being a former smoker, mental health conditions, including depression, and *possibly high blood pressure*[3] as conditions which increase the risk for more severe complications and outcomes from COVID-19 disease).  However, the CDC does not recognize anxiety and/or chronic back/neck pain as ailments that increase one's risk for more severe complications.  Thus, defendant does have conditions that could rise to the level of and provide a basis for the existence of extraordinary and compelling circumstances.   But these conditions are not the sum-total of what the court must consider and the remaining information available meaningfully undercuts defendant's request for compassionate release.

First, the enhanced risks defendant faces within the institution must be balanced against the Bureau of Prisons' persistent and ongoing efforts to control outbreaks of the disease and implement measures that fulfill its statutory obligation to provide inmates with a safe environment and needed medical care.  See https://www.bop.gov/coronavirus; accord United

---

[3]  The CDC distinguishes between pulmonary hypertension and "regular" hypertension.  Id. While pulmonary hypertension (high blood pressure in the lungs) is listed as "a chronic lung disease that can make one more likely to get very sick from COVID-19," "regular" hypertension is only identified as *possibly* making an individual more susceptible to severe illness from COVID-19.  Id.

3

States v. Raia, 954 F.3d 594, 596 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.") (citing the BOP's COVID-19 Action Plan); United States v. Stallings, 2020 WL 3619071, *4 (M.D. Pa. July 2, 2020) (extensive efforts of BOP in preventing and controlling outbreaks of COVID-19 properly are considered in assessing its ability to manage an inmate's institutional and medical needs). That plan has involved modified operations since the initial outbreak of COVID-19, *see* BOP Modified Operations (https://www.bop.gov/coronavirus/covid19_status.jsp), along with refined measures that have been informed by collaboration with the Coronavirus Task Force, the Center for Disease Control and the COVID-19 Vaccine/Therapeutics Operation. https://www.bop.gov/coronavirus.

As of January 5, 2023, the BOP reports having 145,235 federal inmates in BOP-managed institutions and 13,729 in community-based facilities. Its staff complement is approximately 36,000. It has about 198 federal inmates and 248 BOP staff who have "confirmed" positive test results for COVID-19 nationwide. Currently, 47,153 inmates and 14,768 staff have recovered. There have been 309 federal inmate deaths and 7 BOP staff-member deaths attributed to COVID-19 disease. Of the inmate deaths, 11 occurred while on home confinement. Id. These statistics appear to be the product of a reasonable response to and management of the risks posed by the relentless SARS-CoV-2 and its ongoing mutations.

More specifically, defendant was housed at FCI Gilmer when he initially filed his motion.[4]  However, the record indicates that he was transferred to USP Hazelton and the BOP website also reflects this transfer.  USP Hazelton has not experienced any inmate deaths during past outbreaks, and it also had 74 inmates and 284 staff members who have recovered from COVID-19.  Id.  As of this date, the facility is only reporting 1 positive test among inmates and only 1 positive test among staff members.  Id.  These circumstances further undercut the current and recurrent degree of risk which defendant faces.  Cf. United States v. Henderson, -- F. Appx. --, --, 2021 WL 2156910, *2 (3d Cir. May 27, 2021) ("As the [District] Court explained, the outbreak of COVID-19 at FCC-Allenwood (where Henderson was housed) had been contained and, at the time of the decision, there was only 1 active case at the prison complex.  Thus, the risk of Henderson contracting COVID-19 was low and did not constitute an "extraordinary and compelling reason" for a sentence reduction.").

Moreover, the BOP's modified operations plan has included a roll-out of the available vaccines to staff and inmates.  To date, the BOP has been able to administer over 344,419 doses of COVID-19 vaccine to both staff and inmates throughout the nation.  Id.[5]  After the administration of over 660 million doses of the available COVID-19 vaccines under the current emergency authorizations, the CDC continues to report that they are safe and effective.  See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html.  General side effects are minimal and minor and serious adverse reactions have been rare.  Id.  Indeed, anaphylaxis can be treated and successfully controlled shortly after injection through established medical protocol and the rare response of thrombosis with Thrombocytopenia Syndrome after

---

[4]  FCI Gilmer is currently not reporting any positive tests among inmates and only 2 positive tests among staff members.  The facility has only experienced one inmate death; it also reports that 266 inmates and 152 staff members have recovered from COVID-19.  Id.
[5]  This number does not include staff who received their vaccines through a community provider.  Id.

5

receiving the J&J vaccine occurs in women at the rate of approximately seven cases per one million vaccinated individuals. Id. The ongoing availability of the vaccines and their concomitant safety record further diminish the risk of severe sickness or death to all of the inmates under the BOP's care, including defendant. Cf. https://www.bop.gov/coronavirus (noting the increase in control of the virus from the BOP's ongoing roll-out efforts); https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (noting the effectiveness of the approved vaccines against severe illness, complications and death among all age groups).

Against this backdrop, a decision to reject vaccination cannot displace the diminishing effects that the availability of the vaccines have had on the risks facing inmates such as defendant. Absent some compelling justification, the insidious decision to decline the vaccine when offered by the BOP negates an inmate's basic contention that release is warranted due to the existence of extraordinary and compelling medical reasons. See United States v. Jackson, 2021 WL 1145903, *2 (E.D. Pa., March 25, 2021) ("Where Jackson bears the burden of demonstrating her entitlement to relief, the Court finds that her unexplained refusal to accept a COVID-19 vaccination when offered negates her otherwise compelling medical reasons for release.") (collecting cases in support); United States v. Austin, 2021 WL 1137987, *2 (E.D. Mich. March 25, 2021) ("A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination.").

In short, while defendant's medical conditions could create real risks for contracting COVID-19, and to a lesser degree, developing complications resulting in severe illness and/or death, the potential for these risks to materialize must be viewed through the lens of the BOP's ongoing response to the SARS-CoV-2 and its efforts to provide for defendant's medical needs.

Viewed in this context, defendant has not met his burden of demonstrating extraordinary and compelling circumstances warranting his immediate release.

Even assuming for the sake of argument that defendant has presented medical conditions which substantially affect his vulnerability to severe complications in the event he contracts COVID-19, relief still is inappropriate after balancing the applicable § 3553(a) factors. Defendant robbed a bank and did so with an expressed threat of using force and violence or intimidation by using a gun against the tellers, thus marking the admitted crime with a distinct aura of violence.

Defendant had a substantial history of prior criminal conduct. His prior convictions included, among others, theft, receiving stolen property, possession with intent to deliver a controlled substance, owning a firearm as a former convict, and armed robbery of a convenience store.

Defendant likewise had a long history of substance abuse involving both marijuana and alcohol, which began at a young age. He did not have a significant work history during the years preceding the instant offenses.

Defendant's offense conduct, his prior criminal history and his personal background information provide strong justification for the sentence originally imposed. The offense was serious, there was and is a real need to deter others from engaging in similar criminal conduct, and there remains a meaningful need to protect the public from future crimes by defendant. Defendant's plan of re-integration (which contemplates moving in with his brother Travis Kramer, in Butler, Pennsylvania in lieu of serving additional time at a BOP institution) does not

diminish these penological needs.[6]  In other words, defendant's plans do not displace the import of the many factors that support maintaining the sentence as originally imposed.

The guidelines were extensively considered in the parties' negotiations leading to the plea agreement, and defendant received significant benefit as part of that bargaining process.  Further, in light of the criminal conduct at issue and defendant's criminal history, his guideline sentencing range was 272 to 319 months.  In consideration of the guidelines, this court sentenced defendant to 156 months' imprisonment at count two and 120 months at count three, to run concurrently, and 84 months at count four, to run consecutively, for a total term of 240 months.  Nothing has been presented to suggest that the offense conduct would or should be treated less harshly today, especially after recognizing that the defendant's sentence was *meaningfully below* the guideline range.

In short, a review and re-evaluation of the § 3553(a) factors continues to favor the original sentence, even when balanced against the increased risks presented by defendant's medical conditions vis-a-vis the current public health crisis.  Consequently, his motion for relief pursuant to the CARES Act properly has been denied.

s/David Stewart Cercone  
David Stewart Cercone  
Senior United States District Judge

---

[6] The government asserts that defendant's home plan is untenable in any event.  According to the government, defendant's brother was convicted of "Robbery – Threaten Immediate Serious Injury" at case number 812 of 2008 in the Court of Common Pleas of Westmoreland County on January 28, 2009.  He was sentenced to 5 to 10 years' imprisonment.  See Doc. No. 213.  The government maintains that releasing defendant on such a home plan would result in defendant living with a known felon, which in turn would be a violation of the standard conditions that will govern defendant's term of supervised release.  In light of the other grounds supporting the court's disposition of defendant's motion for compassionate release, we need not decide whether the proposed release plan is untenable on its face.

cc:    Ross Lenhardt, AUSA
Adam Cogan, Esquire
Jon Pushinsky, Esquire
William Kaczynski, Esquire

(*Via CM/ECF Electronic Mail*)

Michael J. Kramer
Register #33188-068
USP Hazelton
U.S. Penitentiary
P.O. Box 2000
Bruceton Mills, WV 26525

(*Via First Class Mail*)